JAMES D. McCAULEY, Appellant, *v.* GEORGIA RAILROAD BANK, Respondent.

**Banks and banking — principal and agent — negligence — duty of bank as agent in receiving, holding and releasing collateral for loan by its principal that of due care — whether agent has exercised care a question of fact — insufficiency of evidence to warrant finding of negligence.**

1. The duty of a bank, acting as agent for another, under the general directions of a third, in receiving, holding and releasing collateral for a loan made by its principal is that of due care under the circumstances. If it has knowledge of sufficient facts as to the worthlessness of the collateral and the failing circumstances of the borrower to put it on its guard, it is bound, before accepting such collateral, to communicate its knowledge to its principal so far as the same may be material for the principal to know for the protection or preservation of its interests. Whether or not the agent has exercised such care is usually a question of fact.

2. In an action by the assignee of such a principal against the agent bank to recover money lost through the agent's acceptance of worthless warehouse receipts as collateral for a loan made through the directing bank, evidence that a few days prior thereto defendant had information that a warehouse audit showed more outstanding certificates than merchandise, and that shortly before, the borrower's president had been guilty of some irregularity in the issuance of warehouse receipts, is insufficient to warrant a recovery by plaintiff on the ground of negligence, where an immediate examination was made by the bank, its officers going to the warehouse and demanding a count, from which they were informed that there was more merchandise than outstanding receipts, and other audits showed the same thing, business with the borrower going on in the meantime in the usual

way. The securities were regular on their face. Prior to defendant's employment large sums of money had been loaned on similar certificates by its principal through the directing bank and the latter had authorized the loans in suit and directed defendant to receive the notes and collateral. Under such circumstances the defendant bank had no greater responsibility than it exercised. It was not bound to give notice of its suspicions before investigating and after investigation it seemed unnecessary.

*McCauley* v. *Georgia Railroad Bank,* 218 App. Div. 841, affirmed.

(Argued April 1, 1927; decided May 31, 1927.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered December 21, 1926, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

*Vermont Hatch* and *Aron Steuer* for appellant. The defendant was an agent for the Shawmut Bank and it is immaterial whether it is called an agent, simply or a sub-agent without discretion. As agent or as sub-agent without discretion, it was bound by law to report to the Shawmut Bank or the Bank of Charleston whatever came to its attention which might influence the making of loans or advances to Barrett & Co. upon collateral offered. (*First Nat. Bank* v. *Hayes,* 59 N. E. Rep. 893; *Hegenmeyer* v. *Marks,* 32 N. W. Rep. 785; *Heinemann* v. *Heard,* 50 N. Y. 27; *Edmonstone* v. *Hartshorn,* 19 N. Y. 9; *Clinton Nat. Bank* v. *Nat. Park Bank of New York,* 37 App. Div. 601.)

*Hamilton M. Dawes* and *Morris U. Ely* for respondent.

POUND, J. The plaintiff brings this action as assignee of the National Shawmut Bank, a National bank having its place of business in Boston, Mass. The defendant is a State bank of the State of Georgia having its place of business in Augusta, Ga. The action is to recover damages for the negligence of defendant as agent for the

Shawmut Bank in advancing money to Barrett & Co., Inc., a cotton factoring concern in Georgia, on the security of warehouse receipts for cotton.   The right of the plaintiff assignee to maintain the action in the State of New York was upheld on a motion to vacate an attachment levied herein.   (*McCauley* v. *Georgia Railroad Bank,* 239 N. Y. 514.)

The complaint sets forth two causes of action on each of two transactions, one a loan of July 7, 1923, of $77,000 and one a loan of July 9, 1923, of $55,000.   It is alleged in substance in regard to the first transaction that the Shawmut Bank agreed to loan to the Barrett Company up to $250,000 on demand loans secured by bills of lading or warehouse receipts for cotton through the Bank of Charleston of Charleston, South Carolina, and the defendant undertook to represent the Shawmut Bank and the Bank of Charleston in making loans to and receiving from and holding collateral of Barrett & Co.; that Frank H. Barrett, president of Barrett & Co., was a director of defendant and defendant was largely interested in financing Barrett & Co.; that Bank of Charleston for account of Shawmut Bank requested defendant to receive from Barrett & Co. its demand obligations for $77,000 together with warehouse receipts of Allied Compress Company for 700 bales of cotton; that Barrett & Co. delivered to defendant a demand paper for the amount of the loan and warehouse receipts purporting to cover the cotton; that defendant advised Bank of Charleston to that effect and the latter bank then paid Barrett & Co. the proceeds of the $77,000 loan and was reimbursed from funds of the Shawmut Bank; that on July 7, 1923, defendant knew or had notice that the warehouse receipts of Allied Compress Company were of doubtful value and were being issued irregularly and also that Barrett & Co. were in financial difficulties; that it carelessly and negligently received the warehouse receipts as collateral for the loan of $77,000; that with proper care and investigation it

would have learned that the receipts were fraudulently issued, not against cotton actually in the warehouse or in transit thereto; that Shawmut Bank and Bank of Charleston were ignorant of these facts and of the means of ascertaining them; that Barrett & Co. became bankrupt shortly after July 16, 1923, and the receipts were discovered to be almost worthless to plaintiff's damage $77,000.

The second transaction involving the loan of $55,000 is set forth in substantially the same way except that the defendant advanced $35,000 to Barrett & Co. and the Bank of Charleston $20,000 and took as security therefor warehouse receipts for 500 bales of cotton. Of the $55,000 so advanced $23,000 was for the account of the Shawmut Bank and Bank of Charleston was reimbursed for that amount by Shawmut Bank, to plaintiff's damage $23,000.

The answer admits the payments to Barrett & Co., but puts in issue the other allegations of the complaint. It also pleads payment and that the loans in question were made by the Bank of Charleston on its own account and not for Shawmut Bank.

At the close of plaintiff's evidence it appeared without question that defendant had accepted the collateral mentioned in the complaint; that Barrett & Co. went into bankruptcy soon thereafter and that there was then almost an entire shortage of the cotton represented by the warehouse receipts. The court, however, granted a motion to dismiss the complaint on the following grounds:

(1) That there was no proof to show that the defendant actually knew of the failing condition of Barrett & Co., or the questionableness of Allied Compress receipts and that there was a failure of proof of any facts or circumstances which would put the defendant upon notice.

(2) That as matter of law defendant did all that could be exacted of it as reasonable diligence.

(3) That the defendant was a subagent without discretion who has complied with all of its instructions.

1927.]     Opinion, per POUND, J.     [245 N. Y. 245]

(4) That no damages or basis for damages had been proven in the case.

(5) That there was no proof in the case that the cotton called for by the receipts received by the defendant on the 7th and 9th of July was not actually in the warehouse at the time the receipts were taken by the defendant.

(6) That as to the July 9th loan, there was no proof that the defendant had ever had knowledge that it belonged to the Shawmut Bank in part.

(7) That as to the $77,000 of July 7th, there was no proof that the defendant was notified on July 7th that the loan belonged to the Shawmut Bank.

Although the court did not specify which of these reasons prevailed, it is unnecessary to consider all of them as we arrive at the conclusion that on the question of negligence the plaintiff would not be entitled to recover after giving him the benefit of the most favorable view that a jury would be warranted in taking of the evidence.

The rule of law applicable to the facts may be definitely stated. If defendant acted as agent for the Shawmut Bank in these transactions, although it acted under the general directions of the Charleston Bank in receiving, holding and releasing Barrett & Co. collateral, its duty was that of due care under the circumstances. The directions of the Charleston Bank were as follows: " In all instances we will furnish you with the full particulars as to how the note is to be signed, the time it is to run, the form of the obligation to be executed as well as the collateral security to be pledged." These instructions are of the most general character. The Charleston Bank dictated merely the form of the note and the character of the collateral. It did not leave defendant entirely without discretion or obligate it to receive collateral proper in form but known to it to be worthless in fact. Its duty as such agent is clearly defined. If it had knowledge of sufficient facts as to the worthlessness of the warehouse receipts and the failing circumstances of Barrett & Co. to

put it on its guard, it was bound, in the exercise of "a high degree of fidelity and diligence in the performance of its duties as such agent," before accepting such collateral to communicate its knowledge to its principal so far as the same might be material for the principal to know for the protection or preservation of its interests. The orders of the principal in such a case are subject always to the implied condition that they are not to be executed if the agent has knowledge or notice of dangers which would affect the action of the principal and save him from loss if he had notice thereof. If it had notice that the securities were or might be worthless, it should have promptly communicated the facts to the Shawmut Bank through the Bank of Charleston before accepting the securities. (*Bown Brothers, Inc.*, v. *Merchants Bank*, 243 N. Y. 366.) Whether or not the agent has exercised such care is usually a question of fact but the omission thereof either through inattention, incapacity or intent to defraud is a breach of duty. (*Heinemann* v. *Heard*, 50 N. Y. 27.) The question then is whether or not it is a reasonable inference from the facts that defendant knew, or in the exercise of due care would have ascertained that the Allied Compress receipts were not, when it accepted them, backed by cotton.

A brief and summary history of the parties and the substance of their dealings is as follows: Barrett & Co. was a cotton factor and buyer. Its business was the largest in Augusta. It claimed to be the largest cotton house in the world. Its credit standing was testified to by John Phinizy, vice-president of the defendant, as good up to July 14th, 1923. It handled 100,000 to 200,000 bales of cotton a year. Frank H. Barrett was its president and managing director and he was considered as a successful man of business. He was a director of the defendant bank. The Allied Compress Company was a Georgia corporation and Barrett was its president. It had no warehouse of its own but leased a building or compart-

ments from Atlantic States Warehouse Company, a
Georgia corporation of which John Phinizy, defendant's
vice-president, was president and Hugh H. Saxon, vice-
president and cashier of defendant bank, was secretary
and treasurer. Atlantic States Warehouse Company had
a large plant consisting of thirty acres located three
miles from the city of Augusta. It also leased compart-
ments to Independent Warehouse Company, a third
cotton warehouse. Its superintendent, O'Keefe, was also
the general manager of Allied Compress Company.

Bank of Charleston was Barrett & Co.'s financial
agent in the south and gave it a large line of credit, placing
its paper with other banks. It had placed millions of
dollars of Barrett & Co. loans in this way. Bollinger,
vice-president of National Shawmut Bank, in September,
1922, made an arrangement with Pringle, president of the
Bank of Charleston, whereby Shawmut Bank agreed to
extend Barrett & Co. a line of credit to handle its spot or
transit business to the extent of $250,000 in the form of a
demand note secured by cotton collateral, to be handled
through Bank of Charleston. A loan agreement was
entered into September 13, 1922, between Shawmut Bank
and Barrett & Co. Various loans on this account were
made and payments were made thereon, the last pay-
ment being $100,000 on July 6, 1923. On that date
Barrett & Co. owed Shawmut Bank $32,000 after receiv-
ing such credit.

Defendant's relation to the transaction grew out of a
conversation in October, 1922, between Small, representing
the Charleston Bank, and Saxon, representing the defend-
ant. Defendant undertook to look after the Barrett
collateral in the manner in which Citizens and Southern
Bank had looked after it. Thereafter it made separate
reports on collateral handed by it to the Charleston Bank
under the heading " for account National Shawmut Bank."

On July 7, 1923, Barrett & Co. borrowed $77,000
through the Bank of Charleston for which it delivered to

defendant its demand note and Allied Compress Company receipts purporting to cover 700 bales of cotton. These were taken by- defendant under directions from the Charleston Bank and Barrett & Co. received credit therefor. The receipts were regular in form and the bales were identified by a schedule of marks and weights of the cotton called for. The same is true in substance of the loan of $55,000 on July 9.

What was the duty of defendant in connection with the warehouse receipts of Barrett & Co.?

In May, 1923, defendant's president, Jacob Phinizy, wrote to Frank H. Barrett demanding his resignation as president of Allied Compress Company, as a condition of the continuance of defendant's loaning to Barrett & Co. on Allied receipts, saying in substance that the relationship existing between Barrett and the Allied and Barrett & Co. was too intimate and that the bank examiner would criticize him for holding Allied Compress receipts. From this it might be inferable that the objection was that the warehouse receipts might be regarded as Barrett's own collateral, Barrett being a director of the bank. But Barrett did not resign. The close alliance between the defendant and Barrett thus appears, but knowledge or even suspicion of misconduct does not appear. Barrett was also warned by Phinizy on July 5 that he had been told that Barrett was issuing receipts for cotton which was not actually in the confines of the Allied Company and that the bank could not submit to this under any circumstances. This was quite proper but it again was not a charge of more than irregularity and Barrett promised not to do it again.

On July 2, 1923, defendant held as collateral Allied Compress Company receipts for 5,676 bales, issued to Barrett & Co., and to others. On July 2, Cashin & Campbell made a count of the cotton at the Allied Compress Company warehouse for that company. Their report showed that on July 2 there were only 1,623 bales

of cotton and only 1,262 held for account of Barrett & Co.   On July 3 the report was brought to the bank. Saxon looked it over and said the bank had more receipts than that.   He immediately went to Woodall, the secretary and treasurer of the Allied Compress Company, and they went to Barrett.   Barrett said that the cotton was there in either the Atlantic or the Independent compartments.   These were all in one building.   The bank officials went out to the place at once and demanded of Gercke, the auditor, that he immediately count the cotton. O'Keefe was manager for both the Allied and the Atlantic Company.   This the Charleston Bank knew, as Pringle, its president, was a director of the Atlantic Company. Gercke reported that the cotton was there for all the certificates outstanding, and this was made known to the officers of the Georgia bank.   Besides that, there was an Alexander & Taylor audit, made as of the 3d of July, and this showed outstanding 1,546 receipts; cotton on hand, 1,551 bales.   An audit was also made by a Federal Reserve bank which had made loans, and which was not shown to have resulted in a deficiency of cotton.   Woodall's testimony regarding his conversation with Barrett was as follows: " He remarked that if both the Allied and Atlantic States were checked at the same time, you would find the two would balance with the receipts of both companies outstanding."   This had happened in previous years, so on this occasion Saxon told Barrett that such a method of doing business must not happen again and Barrett gave orders to discontinue it.   Woodall says: " I was advised by Mr. O'Keefe in one of two instances, or probably several instances, that he had issued receipts for cotton, Allied Compress Company's receipts for cotton, that was still in the Atlantic States Warehouse."

O'Keefe is the man who issued all the certificates. They were not issued by Barrett nor by the Allied Compress Company when the cotton was in the warehouse.

John Phinizy, vice-president of the defendant, says regarding this circumstance: "After further talk with Mr. Saxon he reported that he had been around to see Mr. Woodall, and also Mr. Frank Barrett, and talked with both of them, and my recollection is that there was some statement made that a part of the cotton, which was covered by receipts of Allied Compress Company, was in the compartment or compartments of the Atlantic States, and then that afternoon Mr. Saxon and I drove out there, and asked, got Mr. Gercke, and told Mr. Gercke to make an audit count of all three of those. Understand there was an Independent Warehouse Company doing business out there at that time, which had subrented some of those compartments out there, and we wanted a count made, so that if there were any mixed receipts, or any receipts, that cotton could not be identified upon in the individual compartments, it would develop on the entire check being made. We wanted an entire check made."

Mr. Gercke made his report in writing, dated July 7, in which he shows that there were more bales of cotton in the entire building than certificates issued, and tabulates the Allied Compress Company's holdings and certificates in the same way. Acting on this information, the bank made the loans of July 7 and 9. The defendant was interested in this matter for itself as well as for others. It held demand, unsecured claims, amounting to nearly $80,000. If it had had any substantial feeling of wrongdoing it could have refused further credit and prevented the loss to itself which subsequently occurred. It also held as security for its own loans certificates for 550 bales of cotton on which it received nothing.

To summarize: The defendant bank was employed to carry out the instructions as given above from the Charleston Bank, Barrett's financial backer and agent. It advanced money at the direction of the Charleston Bank on certain securities, regular on their face. Over

$234,000 of Shawmut Bank's money had been loaned on these certificates before the defendant bank was employed. On July 2, an audit showed that there were more outstanding certificates than cotton.  An immediate examination was made by the bank, the officers going to the place where the cotton was, and demanding an immediate count.  They could not be expected to count it themselves.  They got a written report and were informed that there was more cotton than outstanding receipts. Other audits showed the same thing.  During this time business was going on with Barrett in the usual way; he reduced the Shawmut Bank loan by a $100,000 payment on July 6; he made deposits of over $400,000 on July 2 and 3.  The defendant bank had loaned him $150,000, of which $80,000 in round numbers was unsecured.  It held certificates for 550 bales of cotton as security.  It was personally and deeply interested in the financial soundness of Barrett & Co.  Business was going on as usual.  The smash came later.

What should it have done that it failed to do in relation to the loans by the Charleston Bank on July 7 and 9? It was in duty bound to itself and others to make investigation when information was received that certificates were being overissued, and this it did.  The sufficiency thereof is to be determined by the facts then known to it or discoverable with proper care.  Viewed in this light it acted with prudence and care under the circumstances.  Viewed in the light of the subsequent failure of the seemingly responsible customer it is plain that it might have done more to protect itself and its principals from loss.  It was guilty of no negligence in failing to notify the Charleston Bank of its suspicions before it made its investigation and after it made its investigation it had no occasion to notify it.  The Charleston Bank had directed the loan and the defendant bank had no greater responsibility than it exercised.  It may have been credulous but it would naturally lend a ready ear to

the explanations of its good customer verified by a disinterested audit. That would not amount to negligence if reasonable men under the circumstances would do the same. The bank officials were not detectives on the track of crime, carelessly neglecting clues.

On the whole it appears that plaintiff failed to produce or offer to produce sufficient competent proof to shift the burden of going on with the case to the defendant or to call upon the triers of fact to draw such inferences as the evidence justified.

The judgment should be affirmed, with costs.

CARDOZO, Ch. J., CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment affirmed, etc.